UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

AMERICAN MANUFACTURING SERVICES, INC.,

                           Plaintiff,

      v.                                           3:05-cv-242

THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF THE MATCH ELECTRONICS
GROUP, INC., U.S. ASSEMBLIES NEW ENGLAND,
INC., U.S. ASSEMBLIES IN RALEIGH, INC.,
MATCH TECHNOLOGIES, U.S. ASSEMBLIES SAN
DIEGO, INC., CAROLINA ASSEMBLIES, INC., U.S.
ASSEMBLIES HALLSTEAD, IND., U.S. ASSEMBLIES IN
GEORGIA, INC., and U.S. ASSEMBLIES ENDICOTT,
INC., et al.,

                           Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**DECISION AND ORDER**

**I.     INTRODUCTION**

       Plaintiff commenced the instant action against Defendants asserting various causes of action.  Plaintiff asserts claims of (1) breach of contract; (2) breach of the covenant of good faith and fair dealing; (3) tortious interference with contractual relations and prospective contractual relations; (4) unfair competition; and (5) a restraint on trade (antitrust) by Defendants.  Presently before the Court are numerous motions by Defendants to dismiss for failure to state a claim upon which relief can be granted.  Most of the claims in the motions are identical to the ones previously denied by the Court. For the reasons stated below, Defendants' motions to dismiss are denied.

**II.     FACTS**

The following facts are taken from the Complaint and, for purposes of this motion, assumed to be true.

This action arises out conduct during the course of bankruptcy proceedings. The debtors are a group of related entities (part of the MATCO Electronics Group ("Group")) in the business of electronic contract manufacturing. James Matthews is the owner. Beginning in the late 1990s, the electronics field experienced a downturn. Matthews sought to sell off the members of the MATCO group and pay down his debt. Many of the Group members were in default to their main creditor, the National Bank of Canada ("NBOC").

NBOC advised that it was going to call its loans and foreclose its security interests in the debtors' assets. The debtors sought to avoid a forced liquidation or bankruptcy, fearing that liquidation or bankruptcy would impair the value of its largest assets - accounts receivable and inventory.

The debtors' secondary secured lender, BSB Bank & Trust Company ("BSB"), agreed to purchase the NBOC loans at a discount on the condition that the debtors' assets were liquidated in an orderly fashion and sold to a new going concern unsaddled by the debtors' enormous debt. A company, T.L. Acquisitions, Corp. ("TLA"), was formed at BSB's insistence to serve as the third party liquidator of the Group.

Plaintiff American Manufacturing Services, Inc. ("AMS") was formed with the intention of purchasing some components of debtors' operations and engaging in the business of electronic contract manufacturing. To be a going concern, AMS would have had to obtain financing and rebuild the reputation and customer base that the Group had lost. AMS shareholders consisted of several

members of Matthews' family and some outsiders (Matthews himself was not a shareholder). The shareholders contributed $4.5 million in capital. The purpose of the arrangement was to avoid the complete cessation of debtors' operations until their assets could be sold at a UCC Article 9 sale. AMS intended to bid at the Article 9 sale.

In December 2001, AMS took over five of the Group's operations. At that time, the debtors' total unsecured debt was about $65 million. Matthews was the Group's largest unsecured creditor.

Also in December 2001, representatives of the debtors and TLA met with representatives of nine of the Group's largest unsecured creditors to discuss the debtors' financial situation and options. The creditors were told they were unlikely to receive anything through bankruptcy and that a non-judicial liquidation plan could result in payment over time of as much as 90% of the unsecured claims. It was explained that, under the non-judicial liquidation plan, Matthews would receive nothing until the unsecured creditors received full payment. The creditors were also told about AMS and AMS's plans to purchase some of the Group's assets for at least $16,500,000. The creditors were urged to hire their own accountants and attorneys (at debtors' expense) to evaluate the liquidation plan.

In December 2001, counsel purporting to represent one or more unsecured creditors sought financial information to consider the proposed non-judicial liquidation. This information was provided. According to Plaintiff, this request and the representation that the unsecured creditors were considering the non-judicial liquidation plan was a sham and was in furtherance of the unsecured creditors' decision to force debtors into involuntary bankruptcy and "exert extreme economic pressure upon AMS in order to extort an immediate 'carve out' in favor of the unsecured creditors and their counsel."

The Article 9 sales were held in January 2002. AMS was the successful bidder. AMD paid $2.4 million for the equipment, machinery, fixings and furnishings at the Endicott, Carolina, Raleigh and Florida locations. The total of AMS's bids for the equipment at all locations was $3.925 million.

AMS then entered into leases with various of debtors' properties and agreed to purchase debtors' inventory at cost (which was greater than market value). AMS then agreed to assist debtors in the collection of their accounts receivable. AMS entered into certain contracts to purchase debtors' real estate and other assets in Endicott and Florida, subject to obtaining suitable financing. AMS also obtained preliminary commitments from BSB and another lender to provide financing for its operations. In essence, AMS contends it was well on its way to fulfill the promise to BSB to pay no less than $16.5 million for debtor equipment, real estate, inventory, and other assets - all part of the non-judicial liquidation plan.

In February 2002, eight creditors forced debtors into bankruptcy proceedings. Six of these eight creditors were present at the December 2001 meeting. AMS contends that this had the effect of putting a cloud over the non-judicial liquidation plan.

In March 2002, AMD and the petitioning creditors, through their counsel, reached an agreement designed to insure the success of AMS. Counsel for the creditors represented that they recognized that the success of AMS was in the best interests of the unsecured creditors and they agreed to cooperate with AMS in its efforts to obtain financing. In exchange, AMS agreed to provide the creditors with comprehensive financial information and not transfer any assets outside the ordinary course of business. This agreement was reduced, at least in part, to a written stipulation. This agreement was not to be filed with the bankruptcy court unless AMS began to dispose of assets it obtained from debtors outside the normal course of business.

In March 2002, the United States Trustee designated the Official Committee of Unsecured Creditors, consisting of Arrow, Avnet, Future, Heilind, Insight, Memec, Jaco, Partminer, Agilsys, and Khoushnood.[1]  Some of these creditors were present at the December 2001 meeting.  The attorneys who previously represented the "unofficial" committee of creditors continued to represent the Official Committee ("Committee").

AMS alleges that, subsequent to March 2002, one or more members of the Committee interfered with AMS's ability to succeed by engaging in such conduct as urging AMS's customers, or potential customers, not to do business with AMS.  It also is claimed that the Committee members conspired not to do business with AMS, even on a COD basis.

In April 2002, the Committee instituted an adversary proceeding and included AMS as a defendant.  AMS claims that, as a result of this proceeding, it lost any chance it otherwise had to obtain the financing needed to continue in business.

In May 2002, the bankruptcy court So Ordered the AMS stipulation (the agreement with the creditors) and ordered compliance therewith.

In June 2002, the debtors brought a Motion to Compromise the controversy with AMS and two other defendants.  The proposal was to release AMS from the debtors' and Committee's claims and, in exchange, AMS would release its claims against debtors, would have paid $5 million for previously purchased inventory and would have continued to purchase inventory from debtors at prices above market value.  The Committee opposed the motion.  The Committee apparently believed that AMS somehow was able to purchase the debtors' assets at prices well below fair market value (the Committee essentially claimed that the non-judicial liquidation plan was a fraudulent scheme to

---

[1] Memec and Khoushnood are no longer parties to this case.

"launder" money and eliminate the unsecured debt). AMS then offered the Committee an option to sell AMS and keep for the unsecured creditors any of the sale proceeds in excess of $11.5 million. The Committee did not respond to the offer. The Court ultimately denied the motion to compromise.

AMS went out of business during 2003. With court permission, AMS returned its equipment and unused inventory to the debtors (which was the relief demanded against AMS in the Committee's complaint). The equipment and inventory was then sold at auction, with the proceeds used to reduce the debtors' debt to BSB.

AMS now contends that:

(1) the Committee and defendants breached the stipulation by engaging in conduct designed to prevent AMS from obtaining financing and otherwise aimed at putting AMS out of business;

(2) the Committee breached the covenant of good faith and fair dealing;

(3) the committee engaged in unfair competition by inducing customers not to do business with AMS and conspiring to refuse to do business with AMS;

(4) the Committee tortiously interfered with contractual relationships;

(5) the Committee tortiously interfered with prospective contractual relationships; and

(6) the Committee's conduct constituted a restraint on trade in violation of NY. Gen. Bus. Law § 340(1).

## III.   DISCUSSION

Presently before the Court are numerous motions to dismiss for failure to state a claim, most of which are identical to previous motions that were denied by the Court.

### a. Standard of Review

"A court may dismiss a complaint [under Fed. R. Civ. P. 12] only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.'" Swierkiewicz v. Sorema N.A., 534 U.S. 506 (2002). In opposing a Rule 12 motion, plaintiff need not make out a prima facie case. Pacheco v. Serendensky, 393 F.3d 348, 352 (2d Cir. 2004). The simplified notice pleading of Rule 8 "relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims." Swierkiewicz at 506. Thus, a complaint is sufficient if it gives the defendant fair notice of the plaintiff's claims, the grounds upon which they rest, and states claims upon which relief could be granted. Id. at 514.

Especially important for the instant action is the exception to the simplified standard of Rule 8(a). The Supreme Court stated that Rule 8(a)'s standard "applies to all civil actions, with limited exceptions." Id. at 513. Rule 9(b) is an example which requires "greater particularity in all averments of fraud and mistake." Id. However, the Supreme Court has declined to extend the exceptions to other contexts, id., and a requirement for greater specificity for particular claims "must be obtained by the process of amending the Federal Rules, and not by judicial interpretation." Id. at 515 (internal citation omitted).

### b. New York Gen. Bus. Law § 340(1)

An antitrust claim is no exception to the above rules. Defendants here claim that Plaintiff's antitrust claim must be dismissed for failure to allege injury to the market. Relying on this Court's decision in Evac, LLC v. Pataki, 89 F. Supp. 2d 250 (N.D.N.Y. 2000), Defendants argue that to survive a motion to dismiss, Plaintiff must plead specific facts demonstrating that Defendants' conduct injured the competitive structure of the market rather than Plaintiff alone, and, in order to do that,

Plaintiff must plead a relevant market. Defendants argue that the Complaint must be dismissed for Plaintiff's failure to allege a relevant market and/or alleging specific facts showing the injury to the market. The Evac decision predates Swierkiewicz. More recently, in Twombley v. Bell Atlantic Corp., 425 F.3d 99 (2d Cir. 2005), the Second Circuit applied the standard set forth in Swierkiewicz and clarified the confusion as to whether there must be specific allegations in an antitrust claim to survive a motion to dismiss. The Second Circuit held that "[a]ntitrust actions are not among [the] exceptions" to the permissive standard of Rule 8. Unless a pleaded conspiracy is implausible on the basis of the facts as pleaded, "a complaint in an antitrust case need only contain the 'short and plain statement of the claim showing that the pleader is entitled to relief' that Rule 8(a) requires." Id. at 111.

Defendants further seek dismissal of the antitrust claim on the grounds that the Complaint fails to allege the requisite conspiracy and they never agreed with one another to discontinue doing business with Plaintiff. The Complaint does allege a conspiracy among Defendants. It further alleges that Defendants agreed to refuse to sell components to Plaintiff, forcing Plaintiff to purchase on the secondary market at inflated prices. The stated purpose of this plan was to put economic pressure on Plaintiff and force it to make cash payments to the creditors. A group boycott can fall within the purview of the Donnelly Act. See Gasoline Retailers Ass'n of Northeastern N.Y., Inc. v. People of the State of New York, 1979 WL 18698 (Sup. Ct. Albany County 1979). Although it is not alleged that Defendants intended to create a monopoly or put Plaintiff out of business, there are allegations of an agreement to restrain trade for an improper purpose.

While it may ultimately prove to be true that Plaintiff will be unable to demonstrate injury to the relevant market, that there was no conspiracy, or that some or all of the Defendants continued to

do business with Plaintiff, thereby defeating this claim, these are factual issues that cannot be determined on a motion to dismiss.

### c. Noerr-Pennington

Defendants claim that some of their activity is immunized by the Noerr-Pennington doctrine. "The Noerr–Pennington immunity is a First Amendment-based doctrine that protects private parties from liability under the Sherman Act in connection with efforts to petition for anticompetitive legislation." Freedom Holdings, Inc. v. Spitzer, 357 F.3d 205, 233 (2d Cir. 2004). "The Noerr-Pennington doctrine generally immunizes from liability a party's commencement of a prior court proceeding." T.F.T.F. Capital Corp. v. Marcus Dairy, Inc., 312 F.3d 90, 93 (2d Cir. 2002). In the instant case, the liability asserted against Defendants is not solely limited to prior litigation. Rather, the prior litigation is alleged to have been one part of the overall conduct which was unrelated to any prior litigation. Even eliminating the prior bankruptcy proceedings as a basis for liability, Plaintiff would still have stated a claim against Defendants based on the other alleged conduct, some of which pre-dated the bankruptcy case. The Noerr-Pennington doctrine is, therefore, not a basis upon which to dismiss Plaintiff's claims at this time.

### d. Qualified Immunity

Defendants next argue that they are entitled to qualified immunity for their conduct on the Creditor's Committee. A Creditors' Committee might be entitled to a qualified immunity "that corresponds to, and is intended to further, the Committee's statutory duties and powers." Pan Am Corp. v. Delta Air Lines, Inc., 175 B.R. 438 (S.D.N.Y 1994). However, this qualified immunity extends only to conduct within the scope of the committee's statutory or court-ordered authority. Id.

If "the Committee engaged in 'wilful misconduct' or 'ultra vires activity,'" the qualified immunity is overcome and the Committee and its members can be held liable for alleged wrongdoing. Id.

Here, the Complaint alleges that the members of the Committee fraudulently induced AMS to sign the stipulation and give access to its financials, engaged in conduct intended to disparage AMS and destroy its business, breached a stipulation approved by the bankruptcy court, and otherwise engaged in various business torts. While this conduct may ultimately not be found to have been wilful or ultra vires, it adequately puts Defendants on notice of the claims against them and alleges conduct that could be found to be sufficiently wilful or ultra vires to overcome qualified immunity. Therefore Defendants' motions on this issue are denied at this stage of the case.

### e.  **Breach of Contract**

Defendants also seek dismissal of the breach of contract claim. Defendants have cited a number of collective arguments in support of this contention, such as: there is no showing that the stipulation was breached; only an oral promise has been breached, and such promises are not specific enough to bind the parties; AMS seeks to expand the stipulation through oral promises; the defendants acted within the scope of their duties; some defendants were not parties to the stipulation in their individual capacities; and there is no showing that AMS has performed its obligations under the stipulation. This Court previously held that the Complaint adequately states a breach of contract claim. The Court will not now disturb that finding.[2] Defendants arguments cannot be resolved on a motion to dismiss. The Court does not have before it all the terms of any alleged agreement and, therefore, is in no position at this time to determine whether the parties entered into a legally enforceable agreement.

---

[2] "The doctrine of the law of the case posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." United States v. Yonkers Bd. of Educ., 856 F.2d 7, 11 (2d Cir. 1988) (internal quotations and citation omitted).

Similarly, Plaintiff's performance under the obligation, like the details of the breach of the obligation itself, cannot be tested on a motion to dismiss. Likewise, Defendants' affirmative defense that they acted within the scope of their authority under the agreement is not properly raised at this juncture. The fact that the petitioning defendants have raised an affirmative defense is adequate in itself to show that the Complaint has put them on notice of the claims against them. Similarly, the Court cannot now ascertain whether the integration clause in the bankruptcy court stipulation covers, or was intended to cover, the matters at issue here. Thus, for these reasons and those asserted in the Court's prior decision, the motion to dismiss the breach of contract claim is denied.

### f. Covenant of Good Faith and Fair Dealing

The foregoing analysis equally serves as reasons to deny Defendants' motions to dismiss the claim for breach of the covenant of good faith and fair dealing. Briefly, the Complaint adequately alleges a contractual relationship and further makes allegations that support a claim for breach of the covenant of good faith and fair dealing that is part of the contract.

### g. Unfair Business Practices

Defendants next claim that they are entitled to dismissal of the unfair business practices claim because AMS has failed to allege misappropriation. Generally, a plaintiff is required to show "'that the defendant misappropriated the fruit of plaintiff's labors and expenditures by obtaining access to plaintiff's business idea either through fraud or deception, or an abuse of a fiduciary or confidential relationship.'" Telecom Intern. America, Ltd. v. AT & T Corp., 280 F.3d 175, 197 (2d Cir. 2001) (quoting Katz Dochrermann & Epstein, Inc. v. Home Box Office, 1999 WL 179603, at *4 (S.D.N.Y. 1999)). However, unfair competition claims encompass a broad range of activities, which generally are "described as encompassing any form of commercial immorality. . . ." Telecom, 280 F.3d at 197;

see also Ronson Art Metal Works, Inc. v. Gibson Lighter Mfg. Co., 3 A.D.2d 227, 230-31, 159 N.Y.S.2d 606, 609-10 (1st Dep't 1957) ("Unfair competition is a form of unlawful business injury. . . . The incalculable variety of illegal commercial practices denominated as unfair competition is proportionate to the unlimited ingenuity that overreaching entrepreneurs and trade pirates put to use."). Here, AMS is alleging product disparagement, which does not require a showing of misappropriation. Verizon Directories Corp. v. Yellow Book USA, Inc., 309 F.Supp.2d 401, 406 (E.D.N.Y. 2004). Accordingly, AMS' unfair competition claim is not deficient for failure to plead misappropriation.

Defendants also claim that there are no allegations that they engaged in any unfair business practices, but, rather, that the Complaint only alleges that the Committee engaged in such practices. Plaintiff responds that it is relying on a civil conspiracy theory, such that one member of the conspiracy may be liable for the acts of another.[3] Although the Complaint does not allege a conspiracy *per se*, it does allege that one or more Committee members, acting together, engaged in various anti-competitive acts. The Complaint makes allegations concerning the members of the conspiracy, the approximate dates when it was formed, and its alleged purpose. All Defendants are alleged to be Committee members. It is not this Court's function on a Rule 12 motion to weight the merits of this claim, but to assess whether there is no set of facts consistent with the allegations in the Complaint that would entitle the Plaintiff to relief. Here, Plaintiff could offer proof of a conspiracy to engage in unfair business practices. If such a conspiracy is found to exist, and if it is found that one or more co-conspirators engaged in unfair business practices, then individual Defendants may be held liable. Thus, the motion in this regard is also denied.

---

[3] "A civil conspiracy is [] a means for establishing vicarious liability for an underlying tort, or a means of establishing joint liability for tortious conduct. It is used to broaden the number of parties liable for tortious conduct." 15A C.J.S. Conspiracy § 8.

### h. **Tortious Interference with Contract**

The same reasoning applies to the motions to dismiss the tortious interference with contract claims. There are allegations in the Complaint that Defendant Arrow tortiously interfered with certain specified contracts and/or interfered with prospective contractual relations. Arrow is part of the committee and/or conspiracy alleged by Plaintiff. Thus, if Plaintiff can demonstrate the existence of the conspiracy and that Arrow's acts were in furtherance of that conspiracy, other Defendants may be liable. Accordingly, these claims will not be dismissed at this stage.

### i. **Compulsory Counterclaims**

Defendants next claim that Plaintiff's causes of action are compulsory counterclaims that should have been raised in the Adversary Proceeding before the Bankruptcy Court. When the Committee brought an adversary action against Plaintiff, Plaintiff did assert counterclaims substantially identical to the ones asserted here. Those counterclaims were dismissed by the Bankruptcy Court for lack of subject matter jurisdiction. The Bankruptcy Court found that the fact that the counterclaims may have been compulsory did not serve as a grant of jurisdiction and that it remained limited to the jurisdiction granted to it by statute.

Without addressing this issue, Defendants seek dismissal of Plaintiff's claims pursuant to Rule 13 because they are compulsory counterclaims. The Court cannot countenance such a result. To dismiss these claims on the ground that they are compulsory and require Plaintiff to assert them in a forum that has determined that it does not have jurisdiction over those claims makes no sense and is inequitable and, thus, contrary to the primary intention to the Federal Rules of Civil Procedure to do justice. Fed. R. Civ. P. 1. This result is not altered by the fact that Plaintiff did not name the individual in the prior action. Based on the reasoning in the Bankruptcy Court's decision and order,

there is no reason to believe it would have found subject matter jurisdiction over claims brought by Plaintiff against the individual members of the Committee.

In any event, Rule 13 requires "[a] pleading" to state any compulsory counterclaims. Plaintiff's did state a counterclaim in the adversary proceeding, thereby complying with the dictates of Rule 13. It just so happens that those claims were dismissed for lack of jurisdiction. There is nothing precluding a party who does not want to assert its claim as a compulsory counterclaim from instituting an independent action on that claim while the first action is pending. 6 Federal Practice and Procedure § 1418. Thus, Plaintiff is not precluded from bringing those claims here while the adversary proceeding is still pending.

### j. Collateral Estoppel

Next, Defendants claim that Plaintiff is collaterally estopped from asserting its breach of contract claims because those matters were decided against it before the Bankruptcy Court. Specifically, Defendants allege that the Bankruptcy Court approved of the commencement of the Adversary Proceeding against AMS and that the Bankruptcy Court rejected the proposed settlement agreement and, therefore, Plaintiff may not re-litigate those issues. Plaintiff responds that the issues presented here are different and that it is not challenging whether the Committee had the authority to prosecute the Adversary Proceeding, but whether that prosecution was in breach of a contract with Plaintiff. Indeed, the Bankruptcy Court authorized the Committee to commence an Adversary Proceeding. It did not, however, rule on the issue of whether such a proceeding was in contravention of any agreements with Plaintiff. Similarly, the Bankruptcy Court did address the proposed settlement agreement, but did not address whether the Committee's conduct in opposing the settlement agreement

constituted a breach of contract. Because there is a lack of identity of issues, collateral estoppel does not apply here.

### k.      Laches

Lastly, some Defendants assert a defense of laches. However, mere lapse of time is insufficient to invoke laches. Advanced Cardiovascular Systems, Inc. v. Scimed Life Systems, Inc., 988 F.2d 1157, 1161 (2d Cir. 1993). "When a limitation on the period for bringing suit has been set by statute, laches will generally not be invoked to shorten the statutory period." Advanced Cardiovascular, 988 F.2d at 1161. It also has been held that the strictures of Rule 12(b)(6) are not readily applicable to the factual issues relevant to a determined of a laches defense. Advanced Cardiovascular, at 1161. "The facts evidencing unreasonableness of the delay, lack of excuse, and material prejudice to the defendant, are seldom set forth in the complaint, and at this stage of the proceedings cannot be decided against the complainant based solely on presumptions." Advanced Cardiovascular, at 1161. In any event, at this stage, Defendants have failed to demonstrate that they have been materially prejudiced by any delay. They merely hypothecate that the adversary proceeding may have proceeded differently had they known that they would be sued individually on these claims.

### l.      Conclusion

To the extent the Court has not directly addressed other arguments raised by Defendants, either they were previously addressed in the Court's prior decision and/or the Court has reviewed those arguments and finds them to be without merit. Further, certain Defendants moved to dismiss claims that Plaintiff has agreed are not stated as to that Defendant. In such instances, the Court has not addressed the merits of the motion to dismiss that claim.

The Court recognizes that the Complaint suffers from various ambiguities and that it may ultimately be the case that Plaintiff has no case against some or all of the Defendants. For example, several defendants have submitted affidavits demonstrating that they continued doing business with AMS, etc. While these facts may be true, they cannot now be considered. What claims are asserted as against which defendants will have to be determined through the discovery process. The merits of any claims will have to be determined at trial or on what the Court fears are likely to be a plethora of motions for summary judgment.

For the foregoing reasons, Defendants' motions to dismiss for failure to state a claim are DENIED.

IT IS SO ORDERED.

DATED: March 28, 2006

Thomas J. McAvoy
Senior, U.S. District Judge